UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| OSCAR MORALES, : | |
|      Plaintiff, : | |
| : | |
| v. : | 3:07-cv-1836 (CFD) |
| : | |
| : | |
| CANCUN CHARLIE'S RESTAURANT, : | |
| et al., : | |
|      Defendants. : | |

## RULING ON MOTION FOR EFFECTUATION OF DEFAULT JUDGMENT

The plaintiff, Oscar Morales ("Morales"), brought this action against Cancun Charlie's Restaurant; PBAC Enterprises, L.L.C., which owns and operates the restaurant; Peter R. Biondi and Christine Henriques Biondi; and William J. Hoffman, seeking monies owed to him for unpaid wages and unpaid overtime that he earned as an employee at Cancun Charlie's. Morales brought a five count complaint alleging violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), the Connecticut Minimum Wage Act, Conn. Gen. Stat. §§ 31-58, *et seq.* ("CMWA"), breach of implied contract, breach of express oral contract, and unjust enrichment. On October 30, 2009, this Court entered a default judgment in favor of the plaintiff. The plaintiff now moves for effectuation of that default judgment.[1]

---

[1] Following the entry of default judgment, the plaintiff withdrew his claims against Cancun Charlie's and William J. Hoffman. In addition, because the default judgment necessarily requires a finding of an express oral contract based on well-pleaded facts in Count Four, the plaintiff's claims of breach of implied contract (Count Three) and unjust enrichment (Count Five) are no longer necessary for the resolution of this case.

-1-

**I.     Factual Background**

Cancun Charlie's was a restaurant, bar, and catering business located in Milford, Connecticut.  In 2004, Peter Biondi founded PBAC Enterprises, LLC, for the purpose of operating Cancun Charlie's.  Peter Biondi was the sole member of PBAC until his wife, Christine Biondi, joined PBAC as a member in December 2006.  Christine Biondi also operated a catering service, "Catering by Christine," that was operated in conjunction with Cancun Charlie's.  This catering service was also part of PBAC.

Peter Biondi managed all aspects of Cancun Charlie's.  He conducted most of the hiring, including hiring the head chef, the dishwasher, the waiters, and the restaurant's managers.  Mr. Biondi was also responsible for terminating employees.  In addition, Mr. Biondi controlled the restaurant's finances, decided employees' salaries, and supervised all employees.  Christine Biondi was present at Cancun Charlie's less than her husband,[2] and largely maintained a marketing and customer relations role.

On June 6, 2004, Morales's friend, who was a dishwasher at Cancun Charlie's, informed Morales about a job opening at the restaurant.  Morales met with one of the restaurant's managers, who conferred with Peter Biondi, and then offered Morales a job in the restaurant's kitchen, which Morales accepted.  Morales's day at Cancun Charlie's typically started around 9 a.m., when he would prepare food that would be used later in the day when the restaurant opened.  Once the restaurant opened, usually around 11 a.m. for lunch, Morales typically cooked fried food.  Morales continued in this capacity throughout the day, in addition to performing a

---

[2] Christine Biondi typically was at Cancun Charlie's "two or three times a week." Aja Smiley Dep. at 19.

variety of other tasks, such as routinely bringing food, ice, and alcohol from the basement up to the kitchen and bar. Each night, after the restaurant closed, Morales cleaned the kitchen and prepared food for the following day. Beginning in December 2005, Morales also prepared food for the restaurant's catering service, which he would later load on to Ms. Biondi's truck. Morales often worked until as late as 3 a.m.

Peter Biondi often supervised workers in the kitchen, including Morales. For example, Mr. Biondi would tell Morales what food he should be preparing at any given time. On occasion, Christine Biondi also supervised Morales and other employees in the kitchen. Specifically, Ms. Biondi supervised the quality of the food being prepared and served to customers at Cancun Charlie's and ensured that the employees kept all aspects of the restaurant clean. Ms. Biondi also instructed employees to perform a variety of tasks for both the restaurant's bar and her catering service.

Peter Biondi controlled the finances of Cancun Charlie's, including employee payroll. Mr. Biondi determined how much the restaurant's managers and employees were paid and often paid the employees himself, including Morales. Mr. Biondi did not maintain permanent records of the hours Morales worked or the amount paid to Morales, and he always paid Morales in cash. In addition, Mr. Biondi never made any of the required withholdings from Morales's pay. Such payment practices were common for all of the "cash" employees at Cancun Charlie's.

When first employed at Cancun Charlie's, Morales recorded the hours he worked on a piece of paper that he would turn into his manager, but Morales eventually began using time

cards to keep track of his hours.[3]  Upon accepting the job at the restaurant, Morales was not informed of his wage, but he was paid on a weekly basis and was always paid in cash. Morales's typical working day was from 9 a.m. to 2 a.m., he received no vacation time, and rarely had a day off.  Even when he did have a free day, he was often called into work.  In Morales's first week at the restaurant, he worked about 100 hours and was paid $400.  For the following four weeks, Morales worked approximately 100 hours and was paid $550 per week.  In the second week of July 2004, Peter Biondi told Morales that he was receiving a pay raise and would earn $8 per hour.  For the remainder of his employment at Cancun Charlie's, Morales worked approximately 100 hours per week during the peak season (May through mid-September); Morales worked approximately 70 hours per week during the mid-season (mid-September through October, March, and April); and Morales worked approximately 60 hours during the low season (November through February).  Despite these long hours, Morales was paid between $700 and $750 per week during the high season, $450 per week during the mid season, and $450 per week during the low season.  Only once did Morales receive more than $750 for his 100 hours of work—he was paid $800 one week—and several times Morales received less than $700 for his work.[4]  Morales occasionally confronted Peter Biondi about being underpaid, but Mr. Biondi always refuted Morales's complaints.  In Morales's final week at

---

[3] Morales submitted to the Court the only three time cards he still had in his possession. These time cards show that Morales worked 93.04 and 99.30 hours in his last two full weeks of work, respectively, and 57.5 hours in his last partial week at Cancun Charlie's.  Due to their apparent lack of record-keeping, defendants have not produced any additional time cards or other record of Morales's hours.

[4] Morales stated in his declaration that he received $625 one week in 2005 and that he received "on occasion $600 for working 100 hours."  Morales Decl. ¶¶ 30, 32.

Cancun Charlie's, he worked 57.5 hours but was never paid, even after returning to the restaurant a few days later to request his earnings. Morales stopped working at Cancun Charlie's on August 11, 2006.

Morales now moves to effectuate this Court's entry of default judgment against the defendants and collect his back wages, damages, and attorneys' fees.

**II.     Discussion**

    A.     Default Judgment Standard

A party's default is "deemed to constitute a concession of all well pleaded allegations of liability. Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). The court should "accept[] as true all of the factual allegations of the complaint, except those relating to damages" and make all reasonable inferences in favor of the prevailing party. Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981). "Damages, which are neither susceptible of mathematical computation nor liquidated as of the default, usually must be established by the plaintiff in an evidentiary proceeding in which the defendant has the opportunity to contest the amount." Greyhound, 973 F.2d at 158; see also Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974). An evidentiary hearing is not necessary, however, "as long as [the court] ensure[s] that there [is] a basis for the damages specified." See Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989).

    B.     Defendants' Liability for Morales's Overtime Pay Under the FLSA

Morales alleged in his Complaint that the defendants did not pay him the required overtime wage for the hours he worked in excess of forty hours per week and therefore violated the FLSA.

Congress enacted the FLSA to curtail labor conditions that affected a worker's "minimum standard of living necessary for health, efficiency, and general well-being." Under the FLSA's overtime provisions, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). "The overtime requirements of the FLSA were meant to apply financial pressure to spread employment to avoid the extra wage and to assure workers additional pay to compensate them for the burden of a workweek beyond the hours fixed in the act." Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009) (internal quotations omitted).

To be liable under the FLSA, one must be an "employer," which is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Supreme Court has recognized that the FLSA's definition of "employer" is expansive, Falk v. Brennan, 414 U.S. 190, 195 (1973), and due to the remedial nature of the FLSA, courts broadly interpret the act's provisions. Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999). The FLSA provides for joint and several liability for all joint employers. See 29 C.F.R. § 791.2(a); see also Barfield v. N.Y. City Health & Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008); Herman, 172 F.3d at 139.

The Second Circuit has adopted an "economic reality" test for determining whether a person or entity is an "employer" under the FLSA. Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984). The test considers "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of

employment, (3) determined the rate and method of payment, and (4) maintained employment records." Id. (quoting Bonnette v. Cal. Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983). These factors, however, are not exclusive. In Zheng v. Liberty Apparel Co., Inc., 355 F.3d 61 (2d Cir. 2003), the Second Circuit held that while satisfying the four-factor test from Carter "can be *sufficient* to establish employer status . . . a positive finding of those four factors is [not] *necessary* to establish an employment relationship." Id. at 69 (emphasis in original). Thus, no single factor of the "economic reality" test is dispositive; rather, courts should employ a flexible approach that considers the totality of the circumstances. Barfield, 537 F.3d at 141–42.

Based on the Court's entry of default judgment (as well as the supporting documents), the Court accepts Morales's allegation, that the defendants violated the FLSA, as true. The record demonstrates that Morales consistently worked more than forty hours per week at Cancun Charlie's but was not paid one and one-half times his regular wage for such hours worked. The defendants concede that PBAC was Morales's employer when Morales worked at Cancun Charlie's and thus is liable for any damages found under the FLSA. Defendants assert, however, that neither Peter Biondi nor Christine Biondi were "employers" as statutorily defined in the FLSA.

*Peter Biondi*

The Court finds that Peter Biondi was Morales's employer, as defined under the FLSA. Peter Biondi exercised control of Cancun Charlie's in all material respects, and specifically with regard to Morales—Mr. Biondi founded PBAC to operate Cancun Charlie's; he was the sole member of PBAC prior to his wife later joining as a member; he held himself out as owner of Cancun Charlie's; and he administered the finances for Cancun Charlie's and PBAC.

Mr. Biondi's conduct and control also satisfies the factors of the "economic reality" test. First, Mr. Biondi had unfettered control in making hiring decisions at Cancun Charlie's. Mr. Biondi regularly hired employees, including the head chef, the restaurant's managers, dishwashers, and Morales. Mr. Biondi also had the power to, and did, terminate employees. Deposition testimony in the record reveals that "if anyone ever gets fired, it's Pete doing that." Smiley Dep. at 31. Second, Mr. Biondi continuously supervised the restaurant's employees. In fact, Aja Smiley, who was a manager at Cancun Charlie's, stated in her deposition that "[Peter Biondi] supervises everyone." Mr. Biondi spent much time in the restaurant's kitchen and often gave Morales, and other staff, orders on what tasks to complete. Mr. Biondi's control and supervision over Morales extended outside of the kitchen. For example, Biondi sent Morales to Dunkin' Donuts for him and had Morales clean his car. Mr. Biondi also supervised the wait staff and controlled the employees' work schedules, including the restaurant's managers' schedules. Third, Mr. Biondi determined the rate and method of payment. For instance, Mr. Biondi had the authority to, and did, sign employee paychecks—a relevant consideration of employer status. Herman, 172 F.3d at 140. In addition to signing paychecks, Mr. Biondi paid some employees, including Morales, in cash—sometimes, even with money from his own pocket—and determined how much an employee would earn, such as when he told Morales that he was receiving a raise to $8 per hour. Mr. Biondi also gave the wait staff cash advances for credit card tips, periodically gave cash tips to the staff, and set the rate of pay for the managers, bartenders, hostesses, and dishwashers. The fourth factor of the "economic reality" test, maintaining employment records, is of little significance here. Mr. Biondi did keep some employment records for Cancun Charlie's, but he admitted in his deposition that many employees, including

Morales, were "off the records [and] off the books." P. Biondi Dep. at 97. The failure of Mr. Biondi to maintain adequate employment records does not, however, preclude this Court from finding that he was an employer under the FLSA. See Wu, et al. v. Chang's Garden of Storrs, LLC, et al., No. 3:08-CV-746, 2010 WL 918079, at *4 (D. Conn. Mar. 11, 2010); Herman, 172 F.3d at 140. In sum, Mr. Biondi managed most of the restaurant's operations and had authority to make all material decisions related to employee work and pay. Consequently, this Court finds that Mr. Biondi is liable as an employer under the FLSA.

*Christine Biondi*

Although Christine Biondi was co-owner of Cancun Charlie's and had a supervisory role in the restaurant, this Court finds that there is insufficient evidence in the record to hold Ms. Biondi liable as an employer under the FLSA. Ms. Biondi's presence at Cancun Charlie's was largely a "customer relations" one. Ms. Biondi did much of the marketing for the restaurant and one of the restaurant's managers testified in her deposition that Ms. Biondi's role was to "make sure everything [was] coming out [of the kitchen] correctly and the restaurant [was] clean and things of that nature." Smiley Dep. at 20. Although Ms. Biondi spent more time at the restaurant before she was pregnant, she still was only "sporadically" at Cancun Charlie's.

The evidence before the Court also does not reflect a finding of employer status based on the "economic reality" test. The record demonstrates that Ms. Biondi did not hire and fire employees, she supervised employees to a lesser extent than Mr. Biondi, she did not determine the rate and method of employees' pay, and she did not maintain the restaurant's employment records. Morales asserts that Ms. Biondi supervised conditions of employment because she instructed him and other kitchen staff on how to properly prepare food and often gave orders to

the staff. While Ms. Biondi did have an active role in the restaurant's catering business and at times supervised Morales specifically with regard to food preparation for the catering, merely engaging in some supervision of employees to improve customer satisfaction is distinct from having an integral role in setting the conditions of employment. See Chang, 2010 WL 918079, at *4. There is also a lack of evidence that Christine Biondi determined the rate and method of payment. Although Christine Biondi paid Morales on at least one occasion, there is no indication that she determined his hourly wage or how any employee at the restaurant would be paid. Plaintiff suggests that because Ms. Biondi wrote personal checks in 2006 and 2007 to PBAC on a weekly basis, she must have had a role in the restaurant's finances. The relevant inquiry, however, is not whether Ms. Biondi had *any* role in the restaurant's finances, but whether she had control of employees' pay for purposes of the FLSA analysis. Finally, whatever employment records were maintained at Cancun Charlie's, such bookkeeping was not done by Ms. Biondi.

Courts have found that managers with some supervisory authority who do *not* have an ownership stake in the restaurant are not employers under the FLSA. See, e.g., Chang, 2010 WL 918079, at *5–6. While Ms. Biondi was a co-owner of Cancun Charlie's, co-ownership should not necessarily result in a finding of "employer" status, or else all persons with an ownership interest, no matter the extent of their involvement in the restaurant, would be liable. Although Morales regarded Ms. Biondi as a supervisor, there is insufficient evidence of control exercised by Ms. Biondi in personnel decisions, employee pay, and conditions of employment. Accordingly, this Court finds that Ms. Biondi is not an employer, and thus is not liable, under the FLSA.

C.  CMWA

Morales alleged in his Complaint that while he was an employee at Cancun Charlie's, he was underpaid in violation of the overtime provisions of the CMWA.

The CMWA "provides wage and overtime guarantees similar to the FLSA." Scott v. Aetna Servs., Inc., 210 F.R.D. 261, 263 n.2 (D. Conn. 2002). The Connecticut Supreme Court, however, has declined to adopt the "economic reality" test that the Second Circuit uses to define an employer under the FLSA. Butler v. Hartford Technical Inst., 704 A.2d 222, 227, n.8 (Conn. 1997). The term "employer," as used in Conn. Gen. Stat. § 31-72, "encompasses an individual who possesses the ultimate authority and control within a corporate employer to set the hours of employment and pay wages and therefore is the specific or exclusive cause of improperly failing to do so." Id. at 227. Because the primary purpose of Section 31-72 is remedial in nature, Connecticut courts have broadly construed the definition of employer. Id. "An individual personally can be liable as an employer [under the CMWA], notwithstanding the fact that a corporation is also an employer of the claimant." Id.

Based on the Court entering a default judgment in favor of Morales, the Court accepts as true Morales's well-pleaded allegation that, as an employee at Cancun Charlie's, he was underpaid in violation of the CMWA. The defendants concede that PBAC was Morales's employer under the CMWA and is thus liable for any damages the Court awards pursuant to the statute, but assert that neither Peter nor Christine Biondi should be considered an employer under the CMWA.

*Peter Biondi*

As set forth in more detail in the foregoing FLSA analysis, Peter Biondi had a substantial

managerial and supervisory role at Cancun Charlie's.  Mr. Biondi was the co-owner of Cancun Charlie's, he exercised a significant degree of control and supervision over all employees, he made the majority of the personnel decisions, he managed the finances for Cancun Charlie's, and he regularly determined how much an employee would be paid and in what manner.  Specifically, Mr. Biondi hired Morales, paid Morales "off the books," and determined his rate of pay, including at times paying Morales with cash from his own pocket.  In sum, it is without question that Peter Biondi had "ultimate authority and control" at Cancun Charlie's and caused Morales to be underpaid.  Accordingly, Mr. Biondi is liable as an employer under the CMWA.

*Christine Biondi*

Despite being a co-owner of Cancun Charlie's, Christine Biondi was not the specific cause of Morales being underpaid in violation of the CMWA.  Ms. Biondi was sporadically present in the restaurant and occasionally supervised Morales's work in the kitchen, but she largely served a marketing and customer relations role.  Even if Ms. Biondi had the power to control hours of employment and employee wages, there are insufficient facts in the record to support a finding that she actually exercised such control.  Accordingly, the Court finds that Ms. Biondi is not liable as an employer under the CMWA.

D.      Breach of Contract & Veil-Piercing

In Count Four of the Complaint, Morales alleged breach of an express oral contract resulting from Mr. Biondi's July 2004 promise to pay Morales $8 per hour.  Following entry of default judgment, this Court accepts as true Morales's well-plead allegation.  Morales now seeks to pierce the corporate veil and hold both Peter and Christine Biondi personally liable for any damages awarded as a result of the breach of contract.

Under Connecticut law, "[c]ourts will disregard the fiction of separate legal entity when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock." Epperson v. Richter, No. 3:01CV1798, 2004 WL 2211715, at *10 (D. Conn. Sept. 24, 2004) (internal quotations omitted).  Connecticut courts recognize two theories for piercing the corporate veil—the instrumentality rule and the identity rule.  The instrumentality rule requires "(a) control in the form of complete domination of finances and policy and business practices, (b) that such control was used to commit fraud or wrong, and (c) that the control and breach of duty must proximately cause the injury complained of."  RBC Bearings, Inc. v. Thin Section Bearings, Inc., No. 3:05cv-00360, 2007 WL 2727160, at *1 (D. Conn. Sept. 18, 2007) (citing Zaist v. Olson, 227 A.2d 552, 558 (Conn. 1967)).  The identity rule requires the plaintiff to show

> such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.

Zaist, 227 A.2d at 558.

To prevail under either theory, the plaintiff must prove "exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice."  Angelo Tomasso, Inc. v. Armor Constr & Paving, Inc., 447 A.2d 406, 412 (Conn. 1982) (internal quotations omitted).

Here, PBAC was a legitimate business enterprise, which owned and operated Cancun Charlie's, and the record lacks any significant indication of abuse of the corporate form by either

Peter or Christine Biondi. Accordingly, this Court finds that Morales has not presented sufficient evidence in order for it to pierce the corporate veil under either theory.

    E.    Damages

Morales seeks damages for the defendants' violations of the FLSA, the CMWA, and the breach of an express oral contract. Specifically, Morales seeks damages in the form of unpaid wages, liquidated damages, and attorneys' fees and costs.

*Unpaid Wages*

The prevailing minimum wage in Connecticut during the time Morales was employed by Cancun Charlie's was $7.10 per hour and $10.65 per hour for overtime.[5] Conn. Gen. Stat. §§ 31-58(j), 31-76(b)–(c). Morales's wage rate for his first five weeks of employment at Cancun Charlie's was unknown, but he was at least entitled to the prevailing minimum wage and any applicable overtime. In the second week of July 2004, Peter Biondi informed Morales that he would earn $8 per hour. Under the overtime provisions in the FLSA and CMWA, an employer must pay the employee one and one-half times his regular wage for every hour worked in excess of forty, not just one and one-half times the minimum wage. 29 U.S.C. § 207(a)(1); Conn. Gen. Stat. §§ 31-76(b)–(c). Therefore, following his pay raise in July 2004, Morales was entitled to receive $12 per hour for overtime work.

"[I]t is well-settled that when an employer fails to keep adequate records of its employees' compensable work periods, as required under the FLSA, employees seeking recovery for overdue wages will not be penalized due to their employer's record-keeping default." Reich

---

[5] From 2004–06, the minimum wage and overtime wage under the FLSA were $5.15 and $7.725, respectively. 29 U.S.C. §§ 206–207 (1996).

v. SNET Corp., 121 F.3d 58, 71 (2d Cir. 1997) (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946). "Employees need only prove that they performed work for which they were not properly compensated and produce 'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id. If the employer is unable "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence," the employee's allegations should be accepted and the court may award approximate damages. Mt. Clemens, 328 U.S. at 687–88. Although some of Morales's assertions as to the number of hours he worked and amount of pay he received are approximate, the defendants have not produced any specific evidence to rebut Morales's claims, and therefore the Court bases the following damages on Morales's allegations and the facts in the record.

The record indicates that Morales was regularly paid less than the amount owed to him under the overtime provisions of the FLSA and the CMWA; Morales worked 100 hours during the restaurant's busy season and was paid an average of $725 per week; he worked 70 hours during the restaurant's mid-season and received $450 per week; and he worked 60 hours during the restaurant's low-season and received $450 per week. Given that Morales's wage, beginning in July 2004, was $8 per hour, he should have received $12 per hour in overtime pay. At such wages, Morales should have been paid $1040, $680, and $560 in the high, mid, and low seasons, respectively. In sum, Morales was paid $64,375 during his employment at Cancun Charlie's but, under the CMWA, he was legally entitled to and should have been paid $91,450.80. Consequently, Morales is awarded $27,075.80 in unpaid wages.[6]

---

[6] A full accounting of Morales's unpaid wages is attached as Table A.

*Interest*

Pursuant to Conn. Gen. Stat. §§ 31-72, 31-265, Morales is entitled to 12% per annum interest on his unpaid wages. Thus, for unpaid wages earned prior to November 15, 2004, six years of interest were added; for wages earned prior to November 15, 2005, five years of interest were added; and for wages earned after November 15, 2005, four years of interest were added. Accordingly, the total amount of unpaid wages with interest owed to Morales is $43,135.78.

*Liquidated Damages*

Both the FLSA and the CMWA permit the recovery of liquidated damages. 29 U.S.C. § 216(b); Conn. Gen. Stat. § 31-68(a).

Under the FLSA, the purpose of liquidated damages is compensatory, not punitive. Reich, 121 F.3d at 71. Courts have the discretion not to award liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. The employer has the burden to prove both subjective good faith and objective reasonableness. Reich, 121 F.3d at 71. "To establish good faith, the employer must take active steps to ascertain the dictates of the FLSA and then act to comply with them." Herman, 172 F.3d at 142. This burden "is a difficult one to meet, however, and [d]ouble damages are the norm, single damages the exception . . . ." Reich, 121 F.3d at 71. (alteration in original) (internal quotations and citations omitted). The defendants have not met this high bar—there is no indication in the record that the defendants took *any* steps to comply with the FLSA's requirements, as pertaining to Morales. Thus, Morales is entitled to liquidated

damages under the FLSA in the amount of $25,808.30.[7]

In contrast to the FLSA, under the CMWA, liquidated damages are punitive in nature. See Shortt v. New Milford Police Dept., 562 A.2d 7, 15 & n.13 (Conn. 1989) (finding that damages under Conn. Gen. Stat. § 31-72 "provide a penalty in order to deter employers from deferring wages once they accrue").  But see Harty v. Cantor Fitzgerald & Co., 881 A.2d 139, 154 (Conn. 2005) (noting that statutory multiple damages under the CMWA are distinct from common law punitive damages, but do serve a "similar punitive purpose").  An employee must show evidence of bad faith, arbitrariness, or unreasonableness to recover double damages under Section 31-72.  See Butler, 704 A.2d at 230.  Here, the evidence before the Court indicates that the defendants made no effort to ensure that Morales was paid in full for his work.  Morales questioned the amount of his pay on multiple occasions and the defendants, specifically Peter Biondi, took no investigatory or corrective measures.  In fact, Mr. Biondi typically responded with profane language and argued with Morales about his complaints.  Furthermore, the amount of Morales's pay was clearly arbitrary—Morales was not informed of his wage until his sixth week of work; no records of Morales's hours were kept; and Morales was paid in cash, including at times, cash from Mr. Biondi's pocket.  Accordingly, Morales is entitled to damages under the CMWA in the amount of his unpaid wages, $43,135.78.

Courts have held that plaintiffs should be able to recover liquidated damages simultaneously under the FLSA and the applicable state statute where the two statutes serve different purposes.  See, e.g., Ke v. Saigon Grill, 595 F. Supp. 2d 240 (S.D.N.Y. 2008) ("[A] prevailing plaintiff who can justify both federal liquidated damages and state-law damages

---

[7] See Table B attached for a full accounting of damages under the FLSA.

should be eligible to recover both, since they also serve fundamentally different purposes." (internal quotations omitted)). Here, the liquidated damages provisions in the FLSA and CMWA serve different purposes—the FLSA damages are compensatory and the CMWA damages serve a punitive purpose. Accordingly, Morales should be permitted to recover under both the FLSA and CMWA and is thus awarded $68,944.08 in liquidated damages.

*Attorneys' Fees and Costs*

Under the FLSA, a prevailing plaintiff is entitled to reasonable attorneys' fees and costs of the action. 29 U.S.C. § 216(b). Even though Morales is represented by non-profit counsel, including law student interns, he is still entitled to recover attorneys' fees. Blum v. Stenson, 465 U.S. 886, 895 (1984); Evans v. Connecticut, 967 F. Supp. 673, 691–92 (D. Conn. 1997). In determining what is a reasonable fee, courts in the Second Circuit should "bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate." Arbor Hill Concerned Citizens Ass'n v. Cnty. of Albany, 493 F.3d 110, 117 (2d Cir. 2007) (emphasis in original). The presumptively reasonable fee is "what a reasonable, paying client would be willing to pay," assuming the client wishes "to spend the minimum necessary to litigate the case effectively." Id. at 112, 118. The Court finds that Morales's request for attorneys' fees at the rate of $80 for law student interns and $350 for clinical supervisors is reasonable. Perez v. By Your Side Homemaker, No. 3:08cv602, 2009 WL 1858263, at *11 (D. Conn. June 25, 2009) (holding that "[t]he hourly rates of $80 and $350 [for law student interns and clinical supervisors], respectively, are reasonable."). The Court also finds the plaintiff's hours are reasonable and accepts the plaintiff's thirty-percent discount for non-contemporaneous hours. Therefore, based on 577 hours of work by law student

interns and 71 hours of work by clinical supervisors, this Court awards attorneys' fees in the amount of $71,215.20.  The Court also awards the plaintiff its reasonable costs incurred, in the amount of $2,138.27.

*Total Damages*

In sum, the Court awards the plaintiff $43,135.78 in unpaid wages with interest, $25,808.30 in liquidated damages under the FLSA, $43,135.78 in damages under the CMWA, $71,215.20 in attorney's fees, and $2,138.27 in costs, for a total of $185,433.33.

### III.   Conclusion

Accordingly, the plaintiff's motion for effectuation of the default judgment [Dkt # 74] is GRANTED.  The clerk is directed to close this case.

SO ORDERED this 23rd day of November 2010, at Hartford, Connecticut.


                **/s/ Christopher F. Droney**
                **CHRISTOPHER F. DRONEY**
                **UNITED STATES DISTRICT JUDGE**